United States District Court
Southern District of Texas
**ENTERED**
February 21, 2018
David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DYNAMIC PRODUCTION, INC. | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 4:17-CV-01032 |
| CIMA ENERGY LTD., et al. | § | |
| | § | |
| *Defendants*. | § | |

### REPORT AND RECOMMENDATIONS

This lawsuit arises from a dispute over the ownership of the oil and gas production from a well in Goliad County, Texas. Before the Court are three motions filed by the parties seeking to clarify and narrow the liability issues before trial. Plaintiff, Dynamic Production, Inc. ("Dynamic"), sued Defendants, CIMA Energy Ltd. and CIMA Energy Management, LLC. (collectively "Defendants" or "CIMA"), for conversion and conspiracy to commit conversion based upon purchase of the production from a well North Shore Energy ("North Shore") drilled. Dynamic claims ownership of the leasehold rights in the well and its production. In response, CIMA asserted the affirmative defense of limitations, and claimed status as a good faith purchaser under the common law and the Texas Uniform Commercial Code.

Dynamic filed a motion for partial summary judgment arguing the evidence establishes CIMA's liability for conversion. Pl.'s Mot. Part. Summ. J. 6, ECF No. 21.[1] CIMA filed a cross motion for summary judgment on its affirmative defenses, which if granted would defeat, in whole or in part, Dynamic's conversion claim. Defs.' Mot. Summ. J., ECF No. 32. CIMA has also filed a motion for partial judgment on the pleadings requesting dismissal of Dynamic's

---

[1] Page references are to the electronic transcript page, not the document page.

prayer for attorney's fees.[2] Defs.' Mot. Part. J. on the Plead., ECF No. 30.

The Court has carefully reviewed the record, the parties' arguments, and the applicable law. The Court concludes that Dynamic's Motion for Partial Summary Judgment as to Liability (ECF No. 21) should be granted, in part, and denied, in part. In addition, Defendants' Motion for Summary Judgment (ECF No. 32) should be granted, in part, and denied, in part. The Court further finds that Defendants' Motion for Partial Judgment on the Pleadings on Plaintiff's Claim for Attorney's Fees (ECF No. 30) should be denied.

## I.      BACKGROUND

This is the second lawsuit for Dynamic Production, Inc. involving the same well in Goliad County, Texas. The Texas Supreme Court described the factual background to this dispute in *North Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598 (Tex. 2016). In June 2009, the Harkins family granted North Shore an exclusive option ("Option Agreement") covering 1,210.8224 acres of land out of a parcel of 1,673.69 acres.[3] *Id.* at 600. Under this agreement, North Shore paid $50.00 for each acre optioned. North Shore was then able to select smaller tracts of land from the whole and lease the mineral rights on just the individual parcels upon which it wished to explore and drill. In its description of the land, the Option Agreement, however, expressly excluded a 400.15 acre tract of land previously leased to Hamman ["the Hamman lease tract"]. *Id.*

In September 2009, North Shore exercised its option to lease 169.9 acres and paid the Harkins family $200 per acre. *Id.* at 600-01. North Shore did not identify the particular tract of

---

[2]  CIMA also filed a motion for judgment on Dynamic's civil conspiracy claims.  Following a hearing on January 19, 2018, Dynamic filed a Motion to Dismiss the conspiracy claims without prejudice, rendering CIMA's motion moot.  *See* ECF No. 49.

[3]  Although North Shore optioned two separate tracts of land, one totaling 1,675.334 acres and the other 1,210.8224 acres, only the second tract is relevant to this discussion.

land it intended to lease from the Harkins family when it made this payment. North Shore also did not execute a lease, even though the Option Agreement required an executed lease and attached a form of lease to the agreement. *Id.* at 601. North Shore drilled a well on the acreage it had selected and obtained a pipeline easement from several members of the Harkins family to construct pipeline. The well began producing oil and gas in January 2010 and North Shore contracted to sell the production from the well to CIMA. Under the terms of the agreement, CIMA purchased the natural gas and condensate that the well produced on a month to month basis, starting on January 31, 2010. Defs.' Mot. Summ. J. 9, ECF No. 32.

Within several months of the well coming online, Plaintiff contacted North Shore to request permission to explore some of the remaining acreage that North Shore had optioned from the Harkins family. *North Shore Energy*, 501 S.W.3d at 601. North Shore refused. Dynamic's attorneys reviewed the Option Agreement and determined that North Shore had drilled the well on land reserved under the Hamman Lease tract and expressly excluded from the Option Agreement. Dynamic informed the Harkins family that North Shore did not have a right under the Option Agreement to lease the land where it had drilled the well. The Harkins family contacted both North Shore and Dynamic and offered to lease the 400.15 acres in the Hamman Lease Tract. *Id.* North Shore declined to pay more than the terms of the Option Agreement to secure a lease on the land. Dynamic offered to pay more per mineral acre, and to increase the percentage of royalties paid to the Harkins family. The Harkins family awarded the lease to Dynamic. *Id.*

Despite knowing that Dynamic had signed a lease with the Harkins family, North Shore continued to produce oil and gas from the well on the Hamman Lease tract and sell it to CIMA. In August 2010, North Shore filed suit against Dynamic and the Harkins Family to invalidate

3

Dynamic's lease, quiet title to the Hamman Lease tract, and reform the Option Agreement to include the Hamman Lease tract ("the Goliad suit"). *Id.* Dynamic and the Harkins family counterclaimed for trespass, tortious interference with contract, and conversion. *Id.* North Shore withdrew its claim for reformation of the Option Agreement, asserted the position that the Option Agreement included the Hamman Lease tract, and sought specific performance of the Option Agreement. *Id.* It also amended its petition to seek recovery for damages from Dynamic's alleged geophysical trespass and tortious interference with the Option Agreement.

In September 2011, the trial court in the Goliad suit granted North Shore's motion for summary judgment and voided Dynamic's lease on the Hamman Lease tract. It then ordered the Harkins family to deliver to North Shore an oil and gas lease for the 169.9 acres North Shore had chosen. North Shore's tortious interference with contract claim remained, and the trial court instructed the jury that the Option Agreement included the Hamman Lease tract. The jury returned a verdict in favor of North Shore in May 2012, and awarded it damages for Dynamic's tortious interference with the Option Agreement. *Id.*

Dynamic and the Harkins family appealed. *Id.* The court of appeals initially upheld the judgment finding that North Shore had proven the parties intended to include the Hamman Lease tract in that agreement. *Id.* at 602. On May 1, 2014, after rehearing, the court of appeals reversed its decision and held that the Option Agreement was ambiguous and summary judgment was improper. It remanded the matter to the trial court for further proceedings. Both sides appealed that decision to the Texas Supreme Court, which issued its opinion on October 28, 2016. The Supreme Court concluded the Option Agreement was not ambiguous in its description of the property covered. *Id.* at 604. Rather, the plain and express language of the Option Agreement specifically excluded the 400 acre Hamman Lease tract. *Id.* The Court held that the Option

Agreement excluded the Hamman Lease tract as a matter of law. *Id.* The Court ruled that, because North Shore did not have a right to the Hamman Lease tract as a matter of law, Dynamic could not be liable for tortious interference for leasing the property from the Harkins family. *Id.* at 605. The Texas Supreme Court further held that Dynamic could not be liable to North Shore for geophysical trespass because North Shore had acquired neither possession nor title to any of the land it had optioned, and thus had no right to exclude Dynamic from exploring it. *Id.* at 605-06. North Shore did have a right to execute a lease on the optioned land and a lease would have given North Shore the exclusive right to explore and produce oil and gas on the land. *Id.* at 605. North Shore, however, never executed that lease and had no possessory interest in any land, according to the Texas Supreme Court. *Id.* at 606. Thus, the Supreme Court remanded the matter to the trial court on December 9, 2016, for further proceedings consistent with its opinion. *Id.*

Ten days later, on December 19, 2016, Dynamic filed this lawsuit against CIMA[4] in the district court of Harris County, Texas. Dynamic alleges that CIMA converted and conspired to convert the production from the well North Shore drilled on the Hamman Lease tract based upon its purchase of the production from North Shore. Pl.'s Complaint, ECF No. 1-3. CIMA filed a third-party claim against North Shore, who subsequently filed for bankruptcy. *See id.*, Exhs. 1 & 3-E, ECF Nos. 1-1, 1-3. Dynamic removed the case to the United States District Court for the Southern District of Texas asserting original jurisdiction in that court under 28 U.S.C. §1452(a) because it was "related to" a pending bankruptcy proceeding. *See* Pl.'s Not. of Rem., 1, ECF No. 1.

---

[4]  Dynamic also sued Gulf Coast Energy Inc., Gulf Coast Gas Gathering, LLC, Genesis Crude Oil, LP, and Eclipse Services, Inc.  Dynamic nonsuited the claims against those parties on March 15, 2017.  Defs.' Mot. Part. J. 3, ECF No. 31.

## II. LEGAL STANDARDS

### A. Motion for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted), *aff'd*, 563 U.S. 277 (2011).

In seeking summary judgment, the "moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Nola Spice*, 783 F.3d at 536 (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Nola Spice*, 783 F.3d at 536; *see also Celotex*, 477 U.S. at 325.

If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. *United States v. $92,203.00 in U.S.*

*Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The non-movant must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *LHC Grp., Inc.*, 773 F.3d at 694). The non-movant must identify specific evidence in the record and articulate how that evidence supports its claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075). However, the court must draw all reasonable inferences in the light most favorable to the non-moving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

## B.      Rule 12(c) Motion For Judgment On The Pleadings

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). A Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard that is applied to a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b) (6). *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007) (citing *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). Under both Rule 12(b) (6) and Rule 12(c), the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Id*.

Federal Rule of Civil Procedure 8(a) sets forth the pleadings requirements in federal cases. It requires "a short and plain statement of the claim showing that the pleader is entitled to

relief." FED R. CIV. P. 8(a) (2). The purpose is to put the defendant on fair notice of what the claim is and upon what grounds it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A bare assertion that the claimant wants relief and is entitled to it does not suffice. *Twombly*, 550 U.S. at 555 n.3.

To survive a motion for judgment on the pleadings, then, "the plaintiff must plead 'enough facts to state a claim that is plausible on its face.'" *Guidry*, 512 F.3d at 180 (quoting *Twombly*, 550 U.S. at 547). The factual allegations in the complaint must be enough to raise a right to relief above the speculative level. *Id*. The court should assume that all the factual allegations in the complaint are true, even if doubtful in fact. *Id*. The ultimate question in Rule 12(c) motions is whether the complaint states a valid claim for relief when it is viewed in the light most favorable to the plaintiff. *Doe v. MySpace, Inc*., 528 F.3d 413, 418 (5th Cir. 2008).

## III.   ANALYSIS

### A.   Dynamic established that CIMA converted its property.

"Conversion is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Mayo v. Hartford Live Ins. Co.,* 354 F.3d 400, 410 (5th Cir. 2004) (quoting *Green International Inc. v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997)). Dynamic must show that it had "ownership, possession, or the right of immediate possession" to prevail on its claim for conversion. *United States v. Boardwalk Motor Sports, Ltd.*, 692 F.3d 378, 381-82 (5th Cir. 2012)*, cert. denied sub. nom*, *Plains Capital Corp. v. United States*, 133 S. Ct. 2854 (2013); *see also City of Wichita Falls v. ITT Commercial Finance Corp.*, 827 S.W.2d 6, 8 (Tex. App.—Fort Worth 1992)*, rev'd in part on other grounds*, 835 S.W.2d 65 (Tex. 1992) ("Either ownership, possession, or the right of immediate possession of the property to the party aggrieved is a requirement for an action in conversion."). Wrongful intent to convert another's property is not an essential element; the defendant need only intend to do an act amounting to

8

conversion. *McVea v. Verkins*, 587 S.W.2d 526, 531 (Tex. Civ. App.—Corpus Christi 1979, no writ). "[A] good faith but unauthorized retention of property can be a conversion." *Geders v. Aircraft Eng. & Accessory Co.*, 599 S.W.2d 646, 651 (Tex. Civ. App.—Dallas 1980, no writ); *see also Rodriguez v. Ortegon*, 616 S.W.2d 946, 949 (Tex. Civ. App.—Corpus Christi 1981, no writ) (good-faith defense not available to excuse actions in conversion suit because wrongful intent is not required); *Adam v. Harris*, 564 S.W.2d 152, 155 (Tex. Civ. App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.) (application to court for declaratory judgment may show good intentions but it does not defeat suit for conversion).

Dynamic asks the Court to grant partial summary judgment in its favor finding that CIMA's purchase of the production from North Shore was a conversion of its property. It argues that the Texas Supreme Court "resolved the title question involving the underlying mineral interests involved in this case in favor of Dynamic" when it issued the opinion in the Goliad suit. Pl.'s Mot. Part. Summ. J. 6, ECF No. 21. Because it prevailed in the title dispute with North Shore, Dynamic insists that CIMA converted its property as a matter of law.

CIMA does not directly contend, in either its motion or in its response to Dynamic's motion, that Dynamic did not own the oil and gas at issue.[5] CIMA also admits that it purchased the production from North Shore. See Defs.' Mot. Summ. J. 9, ECF No. 32. However, CIMA argues that it is not liable for conversion because it was a good faith purchaser for value under the Texas Business & Commerce Code and the common law. *Id.* at 14-16.  CIMA also contends

---

[5] During oral argument, CIMA did argue that the Texas Supreme Court ruling in the Goliad case was not necessarily determinative that a conversion of Dynamic's property has been established. Oral Argument at 9:58, January 19, 2018, hearing.  CIMA contended that the Goliad suit only established title to the minerals while in the ground, and did not establish title to the production of those minerals at the surface.  *Id.*  Since there has been no final ruling in the Goliad case, CIMA implied, there is still a fact question as to the true ownership of the production.  CIMA also explained a non-owner may have the legal right to operate a well and sell the production, such as under a joint operating agreement or production agreement, so the Goliad Court's finding that North Shore did not own the rights to the minerals did not prove that North Shore had no right to operate the well and sell the production.  Oral Argument at 10:01, January 19, 2018, hearing.  CIMA has produced no evidence of any such agreement.

that Dynamic's claims are barred, in part, by the statute of limitations.  *Id.* at 11-14.

1.      **The evidence shows that Dynamic is the owner of the production from the well.**

The Supreme Court's opinion in the Goliad case does not, despite Dynamic's insistence, clearly and expressly establish that a conversion of its property occurred. The trial court in the Goliad case initially invalidated the lease between Dynamic and the Harkins family so as to remove "a cloud on the rights, titles and interests held by North Shore Energy, Inc." under the Option Agreement. *See* Pl's. Mot. Part. Summ. J. App. 1, Ex. A-3, ECF No. 22.  The Texas Supreme Court reversed this summary judgment because the "Option Agreement excluded the 400-acre Hamman Lease tract from the optioned acreage as a matter of law." *North Shore Energy,* 501 S.W.3d at 604. The Court also held that Dynamic could not be liable for tortious interference for leasing the land in the Hamman Lease tract because North Shore had no right to that land under the Option Agreement. *Id.* at 605. The impact of the Supreme Court's ruling is that North Shore did not own or lease either the land or the mineral rights in the Hamman Lease tract where it drilled the well. A finding that North Shore did not own the production from the well, however, is not commensurate with a finding that Dynamic did.

However, in reversing the trial court's summary judgment, the Texas Supreme Court reinstated the lease between Dynamic and the Harkins family for the 400 acres contained in the Hamman Lease tract. That lease "grants, leases and lets, exclusively unto [Dynamic] for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil and gas . . . to produce, save, take care of, treat, transport and own said products produced from the land . . . ." Pl's. Mot. Part. Summ. J.  App. 1, Exhibit A-1, at ¶ 1, ECF No. 22. This language gives Dynamic the exclusive right to produce and own the oil and gas from the Hamman Lease tract. In the lease, the Harkins family represented that they had neither leased to, nor authorized,

North Shore to enter on that land and drill a well. *Id.* at ¶ 31. CIMA has produced no evidence that the Harkins family did in fact lease the Hammons Lease tract to North Shore, and the Supreme Court decision holds they did not.  *North Shore Energy*, 501 S.W.3d at 605-606.

North Shore drilled a well on land it did not lease and to which it had no right. CIMA has provided no evidence that the Harkins family authorized North Shore to drill the well on the Hamman Lease tract. That the Harkins family did not stop North Shore from drilling the well on land it had not leased, at a time when the family apparently did not know where North Shore intended to drill, is not evidence it authorized North Shore's wrongful conduct in drilling where it had no right. The subsequent action of the Harkins family establishes, in fact, that they did not authorize North Shore's actions. When the Harkins family learned that North Shore had drilled in the wrong place, they took affirmative steps to show they did not acquiesce to North Shore's possession of the well. The family first offered North Shore the opportunity to lease the Hamman Lease tract so that it would legally own production from the well. Pl's. Mot. Part. Summ. J. App. 2, Ex. B, at 55:1-56:23, ECF No. 23 When North Shore declined, the Harkins family then leased the land to Dynamic, and counterclaimed against North Shore for conversion and trespass for drilling the well and selling the production. *Id.* at App. 1, Ex. A-1, ECF. No. 22; *North Shore Energy, L.L.C.*, 501 S.W.3d at 601. This evidence establishes that the Harkins family did not "authorize" North Shore to operate the well and sell the production to CIMA. *See RE/MAX Int., Inc., v. Trendsetter Realty, LLC, et al.*, 655 F.Supp.2d 679, 710 (S.D. Tex. 2009) (holding that a party "did not delay in filing suit so as to give 'implied permission'" to use of trademark). Likewise, CIMA has produced no evidence indicating that either the Harkins family or Dynamic gave any ownership interest in the oil and gas to North Shore. Instead, the only evidence shows that the Harkins family leased the mineral rights for the Hamman Lease tract to Dynamic. Pl's.

Mot. Part. Summ. J. Exhibits A-1 & B, at 55:1-56:23, ECF Nos. 22, 23.

CIMA took delivery of gas and condensate production from the well from January 2010, until March 2016, and paid North Shore for that gas. Defs.' Mot. Summ. J. 9 and Exhs. E-F, ECF No. 32. Accordingly, when CIMA purchased and took possession of the production of the well from North Shore, it "wrongfully exercised dominion and control over the [production] in denial of and/or inconsistent with [Dynamic's] rights." *Pemex Exploracion y Produccion v. BASF Corp.,* Cause Nos. H-10-1997, H-11-2019, 2013 WL 5514944, at *31 (S.D. Tex. 2013). A party who purchases and then sells stolen property is subject to a cause of action for conversion. *See Sandford v. Wilson*, 2 Willson 188, 1884 WL 8120, *1 (Tex. 1884) ("When the possession of personal property is wrongfully acquired in the first instance, and is transmitted successively to several [parties], each possession is a new conversion."). CIMA's purchase and possession of the production from the well was a conversion of Dynamic's property, even if it did not intend it to be, unless CIMA has a defense. *McVea,* 587 S.W.2d at 531.

### 2. CIMA's affirmative defense that it is a good faith purchaser fails.

CIMA argues that it is shielded from liability for conversion because it was a "good faith purchaser for value" and a buyer in the ordinary course of business under Texas Business and Commerce Code § 2.403 and the common law. Defs.' Mot. Summ. J. 14, ECF No. 32. A bona fide –or good faith– purchaser for value has an affirmative defense against a conversion claim. *Carter v. Cookie Coleman Cattle Company, Inc.,* 271 S.W.3d 856, 858 & n. 3 (Tex. App.— Amarillo 2008, no pet). To qualify as a good faith purchaser under the common law, CIMA must prove: (1) it purchased gas and condensate from North Shore in good faith, (2) for valuable consideration, and (3) made the purchase without actual or constructive knowledge of any outstanding claims of a third party. *NRG Exploration, Inc. v. Rauch,* 671 S.W.2d 649, 653 (Tex. App.—Austin 1984, writ ref'd n.r.e.). To attain good faith purchaser status under the Texas

12

version of the UCC, a party must be: (1) a purchaser, (2) that gave value, and (3) acted in good

faith. TEX. BUS. & COM. CODE § 2.403(a). Notably, one can be a good faith purchaser under this

section even if it knows there is a dispute over the ownership of the goods. *In re Samuels & Co.,*

526 F.2d 1238, 1243–44 (5th Cir. 1976) (§ 2.403 does not does not require absence of

knowledge of third party claims, and deviates from the common law on that element); *Rogers v.*

*Ricane Enterprises, Inc.,* 930 S.W.2d 157, 175 (Tex. App.—Amarillo 1996, writ denied) (same).

Section 2.403 of the Texas Business and Commerce Code describes the rights and title a

purchaser receives in a sales transaction. It provides:

> (a)    A purchaser of goods acquires all title which his transferor had or
> had power to transfer except that a purchaser of a limited interest
> acquires rights only to the extent of the interest purchased. A
> person with voidable title has power to transfer a good title to a
> good faith purchaser for value. When goods have been delivered
> under a transaction of purchase the purchaser has such power even
> though
>
> > (1)    the transferor was deceived as to the identity of the
> > purchaser, or
> >
> > (2)    the delivery was in exchange for a check which is later
> > dishonored, or
> >
> > (3)    it was agreed that the transaction was to be a "cash sale", or
> >
> > (4)    the delivery was procured through fraud punishable as
> > larcenous under the criminal law.

TEX. BUS. & COM. CODE § 2.403. A purchaser of goods cannot acquire greater rights and title

than the transferor has, except when a person with voidable title transfers the goods to a good-

faith purchaser for value: then the purchaser receives good title. *NXCESS Motor Cars, Inc. v.*

*JPMorgan Chase Bank, N.A.,* 317 S.W.3d 462, 470 (Tex. App.—Houston [1st Dist.] 2010, pet.

denied). The rule is simple: a good faith purchaser from a seller with voidable title receives good

title; in all other instances, the purchaser receives the same title as held by the seller.

Since Dynamic has established it was the owner of the production, the inquiry must focus on whether North Shore had any title it could pass to CIMA. The UCC provides for the creation of voidable title where there is a voluntary transfer of goods through a transaction of purchase. *Kotis v. Nowlin Jewelry, Inc.,* 844 S.W.2d 920, 923 (Tex. App.—Houston [14th Dist.] 1992, no writ); Tex. Bus. & Com. Code § 2.403(a). The code does not define a "transaction of purchase," but it does define a "purchase" to be a "taking by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift or any other voluntary transaction creating an interest in property." Tex. Bus. & Com. Code § 1.201(32). From this language, the courts have concluded that a transaction of "purchase" requires a voluntary transfer by the seller. *See Kotis,* 844 S.W.2d at 922. Accordingly, under the code, a thief who wrongfully takes goods against the will of the owner is not a purchaser, but a swindler who fraudulently induces the owner to deliver the goods is. *Id*. (citations omitted); *see also NXCESS Motor Cars, Inc*., 317 S.W.3d at 468.

CIMA insists North Shore had "voidable title," but it has produced no evidence suggesting there was a voluntary transfer of ownership of the oil and gas from Dynamic to North Shore to satisfy the requirement that it be from a transaction of purchase. CIMA argues only that North Shore had numerous indicia of title, including the P-4 certificates filed with the Texas Railroad commission designating North Shore as the owner and operator of the well, the Option Agreement it signed and filed in the county records, the royalties it paid to the Harkins, the fact that it owned all of the equipment at the well, and the order from the trial court in the Goliad suit finding that North Shore was the owner of the well and the production. Defs.' Mot. Summ. J. 15-16, ECF No. 32. These facts bear on whether CIMA's purchase was made in good faith[6] because it believed North Shore had title, not on whether North Shore actually had any title to pass to

---

[6]  "Good faith" consists of honesty in fact and the observance of reasonable commercial standards of fair dealing and incorporates both subjective honesty and objective commercial reasonableness components. Tex. Bus. & Comm. Code § 1.201 (20).

CIMA. Unfortunately for CIMA, "[t]he defense of good faith is not available to a party to excuse his actions in a conversion suit." *McVea,* 587 S.W.2d at 531. "The requisite intent is only one to assert a right in the property, and a wrongful intent is not required." *White-Sellie's Jewelry Co. v. Goodyear Tire & Rubber Co.,* 477 S.W.2d 658, 662 (Tex. Civ. App.—Houston [14th Dist.] 1972, no writ).

It is well settled that one cannot enter another's land and drill for oil without the consent of the owner of the mineral interests. *Bender v. Brooks,* 103 Tex. 329, 335, 127 S.W. 168, 170 (1910) (action for damages for lost oil and for trespass to try title against trespasser). The Texas Supreme Court has already ruled that North Shore did not lease the land in the Hamman Lease tract and did not have an interest in the mineral rights on that land under the Option Agreement. North Shore, then, had no right to drill a well on that land and remove oil and gas. North Shore's mistake in drilling the well on land it did not lease, even if made in good faith, did not give North Shore voidable title to the production from the well. *See Right of Way Oil Co. v. Gladys City Oil, Gas & Mfg. Co.,* 106 Tex. 94 (1913) (an innocent trespasser has no right to drill a well, and is therefore liable for the cost of the oil he extracts); *Hunt v. HNG Oil Co.,* 791 S.W.2d 191, 193 (Tex. App.—Corpus Christi 1990), *declined to follow on other grounds, Wagner & Brown, Ltd. v. Sheppard,* 282 S.W.3d 419 (Tex. 2008) (confirming the rule that "a good faith trespasser is liable in damages only for the value of the minerals removed less drilling and operating costs."). North Shore's mistake did not allow it to obtain any title to the oil, regardless of its innocence. *Bender,* 103 Tex. at 335, 127 S.W. at 170 ("Appellants had the exclusive right as owners of the soil to take oil therefrom, and the appellee by an invasion of their right and removal of the oil, no matter how innocently, could not acquire title thereto.").

Because North Shore obtained no title to the production when it trespassed, it had none to

transfer to CIMA. *See Benjamini, Inc. v. Dickson,* 2 S.W.3d 611, 613 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("One who purchases stolen property from a thief, no matter how innocently, acquires no title in the property; title remains in the owner."); *Nxcess Motor Cars, Inc.,* 317 S.W.3d at 470 ("Because Avatar Trust possessed void, and not voidable, title, it could not transfer valid title to NXCESS."); *see also Olin Corp. v. Cargo Carriers, Inc.,* 673 S.W.2d 211, 216 (Tex. App.—Houston [14th Dist.] 1984, no writ) (holding that one who purchases stolen property from a thief, no matter how innocently, acquires no title in the property). It is irrelevant, then, if CIMA is a good faith purchaser because it still received no title. *See Olin Corp.,* 673 S.W.2d at 216 (noting that the jury's finding that Cargo Carriers was a good faith purchaser for value was immaterial to Olin's right to recover the value of its stolen goods from Cargo Carriers); *see also Pemex Exploracion y Produccion,* 2013 WL 5514944, at *18 ("The general rule is that the owner of stolen property can recover it or its value from anyone who has received it and exercised dominion over it.") (quoting *Sinclair Houston Federal Credit Union v. Hendricks,* 268 S.W.2d 290, 295 (Tex. Civ. App.—Galveston 1954, writ ref'd n.r.e.)). Because North Shore converted Dynamic's property, the protections of section 2.403(a) do not apply to CIMA's purchase.

CIMA alternatively argues that North Shore was a merchant entrusted with goods under section 2.403(b). Defs.' Mot. Summ. J. 19, ECF No. 32. If true, this status would give North Shore the power to transfer good title to CIMA. The rule is explained in subsection 2.403(b) and (c) of the Texas Business and Commerce Code:

> (b)     Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.
>
> (c)     "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless

of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

The code further defines several terms pertinent to this defense:

> (9)   "Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind. . . . A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind.

> \* \* \*

> (19)   "Good faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing.

TEX. BUS. & COM. CODE ANN. § 1.201(9), (19). Section 2.403(b) codifies the common law rule that "although a seller may have possession and represents that he has title to the property, an innocent purchaser still cannot defend against the true owner, unless there has been some . . . affirmative act by the owner which either creates apparent authority to sell the property in the seller or clothes the seller with the indicia of ownership." *Olin*, 673 S.W.2d at 216 (emphasis added).[7] This is because an owner who delivers property to a merchant who sells goods of that kind, or allows that merchant to retain possession of his goods, should not be surprised if the merchant then sells those goods. *See, e.g., Scruggs v. Crockett Auto Co.,* 41 S.W.2d 509 (Tex. Civ. App.—Austin 1931, err. dism'd) ("Where the commodity is sent in such a way and to such a place as to exhibit an apparent purpose of sale, the principal will be bound, and the purchaser safe."). Both the common law and the Uniform Commercial Code require the owner to have taken some affirmative conduct before the exception applies. *See, e.g., Pemex Exploracion y Produccion,* 2013 WL 5514944, at \*18 (pointing to the lack of any evidence that the owner

---

[7] Section 2.403(b), then, is an exception to the general rule that in a bailment situation, no title passes between the bailor and the bailee. *See, e.g., Shosid Hughes Tool Co.,* 258 S.W.2d 945, 948 (Tex. App. —Dallas 1953, writ ref'd n.r.e.) (". . . a bailor-bailee relationship wherein no title passed to the bailee. Under such bailor-bailee relationship the bailee had no title to convey, even to an innocent purchaser.").

"took affirmative action to clothe [sellers] with the indicia of ownership" to explain denial of good faith purchaser defense).

CIMA argues, and Dynamic does not dispute, that North Shore is a merchant under this section because it was a seller at the wellhead. Defs.' Mot. Summ. J. 19, ECF No. 32. CIMA frames the focus, appropriately, on "whether North Shore was entrusted with possession of the Well and the Production, or whether the Harkins family and/or Dynamic acquiesced to North Shore's possession of the Well and Production." *Id.* CIMA has not argued that Dynamic delivered and thus directly entrusted the production from the well to North Shore. Instead, CIMA contends that Dynamic and the Harkins family "acquiesced to North Shore's possession of the Well and Production for over six years," creating apparent authority for North Shore to sell the Production. *Id.* CIMA identifies five "facts" to support its contention that Dynamic acquiesced to North Shore's possession of the well and Production:

1. North Shore is the registered P-4 operator of the Well with the Texas Railroad Commission and neither Harkins nor Dynamic challenged that designation;

2. North Shore paid royalties to Harkins, as lessors;

3. All equipment at the wellsite is owned and was paid for by North Shore and [Dynamic] has made no attempts to remove that equipment;

4. Dynamic did not seek injunctive relief to prevent North Shore from selling the Production to CIMA, or prevent CIMA from purchasing the Production, nor did Dynamic seek to add CIMA as a party . . . to the Goliad Case; and

5. North Shore filed the Option Agreement in the county records of Goliad County;

*Id.* at 19-20; Defs.' Resp. 27, ECF No. 39.

While this evidence could support CIMA's claim that it acted in a commercially reasonable manner and in good faith when it purchased from North Shore, it does not meet its

burden to show that Dynamic affirmatively clothed North Shore with the "indicia of ownership." CIMA's evidence falls in three categories; 1) the action of others; 2) the actions of others that Dynamic did not stop; and 3) Dynamic's inaction. None of this is evidence that Dynamic took any affirmative act, and so it cannot be evidence that Dynamic affirmatively clothed North Shore with the indicia of ownership.

Alternatively, CIMA must show that Dynamic acquiesced to North Shore's conduct to prevail on this defense. To acquiesce is to give implied consent to a transaction. *Rogers*, 930 S.W.2d at 174 (citing BLACK'S LAW DICTIONARY 14 (6th ed. 1991)). The actions of others cannot establish Dynamic's acquiescence. North Shore's payment of royalties, securing of a P-4 certificate from the Railroad commission, filing of the Option Agreement with Goliad County, and ownership of the well equipment do not show that Dynamic acquiesced to North Shore's possession. It shows only that North Shore took steps consistent with its own (mistaken) belief that it had leased the mineral interests in the land covered at issue.

It is true that if Dynamic failed to contest North Shore's actions, it could be found to have acquiesced to North Shore's possession. *See id.* at 170-175 (noting that "the passage of a substantial period of time after the drilling of the producing wells" before title to the land was contested was evidence supporting the jury verdict of acquiescence). CIMA argues that Dynamic failed to challenge the P-4 designation, did not attempt to remove North Shore's equipment, and did not request injunctive relief. Defs.' Mot. Summ. J. 19, ECF No. 32. With this, CIMA has produced some evidence from which a jury could find that Dynamic acquiesced to North Shore's possession of the production. However, Dynamic counters that it sued North Shore for conversion, sought to have a receiver appointed, asked for the production proceeds to be placed into the registry of the court, and appealed the unfavorable rulings to the Texas Supreme Court.

This, Dynamic argues, is evidence it did not acquiesce to North Shore's possession of the well and production. Pl. Resp. 6, ECF No. 37.

Generally, the question of whether a party acquiesced is a question of fact to be decided at trial. *See Luxottica Grp. S.p.A. v. Atl. Sunglasses LLC,* No. 4:15-CV-1795, 2017 WL 6885602, at *10 (S.D. Tex. Mar. 24, 2017) (granting summary judgment when there was no evidence of acquiescence to raise material issues of fact). However, it is axiomatic that a party that sues to enforce its rights has not acquiesced to another's usurpation of those rights. *See, e.g., RE/MAX Int., Inc.*, 655 F.Supp.2d at 710 (noting that timely filing suit was evidence a party did not acquiesce to another's use of its trademark); *Pennsylvania Steel Co. v. New York City R. Co.*, 198 F. 721, 730 (2d Cir. 1912) ("If the lessor do[es] not acquiesce—if it knock[s] at the door of the court and demand[s] back its property . . ."). In the Goliad case, Dynamic sued North Shore for conversion. *North Shore Energy, L.L.C.*, 501 S.W.3d at 601. When it did, CIMA could no longer credibly believe that Dynamic "entrusted" the production of the well to North Shore or acquiesced to North Shore's possession of the production.[8] Although knowledge of the lawsuit does not necessarily defeat CIMA's status as a good faith purchaser under section 2.403(a), it does mean that CIMA cannot prove that Dynamic acquiesced under section 2.403(b) to North Shore's possession of the well. Dynamic insists that CIMA was aware of the title dispute from its inception because North Shore and CIMA discussed the problem with the Option Agreement in March 2010, before Dynamic signed the lease. Pl's. Mot. Part. Summ. J. 13 and Exhibits B-3 & B-4, ECF Nos. 21, 24. At a minimum, CIMA admits it learned of the dispute in September 2011, when it "received its first update on the Goliad Case." Defs.' Mot. Summ. J. 10, ECF No. 32.

---

[8]  The same reasoning applies to any contention that the Harkins family acquiesced to North Shore's possession. Upon learning that the well North Shore drilled was on land contained in the Hammons Lease tract, the Harkins family approached North Shore about leasing the tract, leased it to Dynamic, and counter-claimed against North Shore in the Goliad suit.  *North Shore Energy, L.L.C.*, 501 S.W.3d at 601.

Any protections that section 2.403(b) might provide necessarily ended at that time.

CIMA cannot avail itself of the good faith purchaser protections of section 2.403(a) or the common law because North Shore had no title. There was no voluntary transfer of the mineral rights from Harkins or Dynamic to North Shore. Without a voluntary transfer, North Shore could not acquire possession of the well or production through a transaction of purchase, and did not acquire voidable title to pass to CIMA. CIMA also does not benefit from the protections of section 2.403(b). CIMA has not shown that Dynamic delivered the product and entrusted the production from the well to North Shore. Even if CIMA had, the evidence establishes that any entrustment by acquiescence ended no later than September 2011; therefore, any purchases CIMA made after that date would be conversions.[9]

## B.    Conversion Claims Arising from Purchases that Occurred Before December 19, 2014, are Time Barred

It is well settled that, in a diversity case, federal courts apply federal procedural law and state substantive law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Federal courts view statutes of limitations as substantive law. *See Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 109 (1945). Therefore, an *Erie* Court looks to the forum state's law to determine the applicable statute of limitations. *See Ellis v. Great Sw. Corp.*, 646 F.2d 1099, 1103 (5th Cir. 1981) ("[I]n diversity lawsuits, a federal court is ordinarily bound to look to the choice of law rules of the state in which it sits to determine whether the state courts of that state would apply their own state's statute of limitations or the statute of limitations of some other state.").

In Texas courts, statutes of limitations are viewed as procedural in nature. *See Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126, 141 (Tex. 2010). Thus, Texas courts do not

---

[9] Because any claim for conversion made based on purchases more than two years before this case was filed on December 19, 2014 are time barred, *see infra* § B., it is not necessary to review the transactions before September 2011.

undertake a choice of law analysis when it comes to statutes of limitations; instead, they enforce the Texas limitations periods. *See Western-Southern Life. Assur. Co. v. Kaleh*, 193 F. Supp. 756, 771 (S.D. Tex. 2016) (applying Texas statute of limitations to guaranty claim under Ohio law); *In re BP p.l.c. Sec. Litig.*, 51 F. Supp. 3d 693, 696–98 (S.D. Tex. 2014) (applying Texas two-year statute of limitations to bar misrepresentation claim controlled under English Law).

### 1. The statute of limitations for Dynamic's conversion claims is two years from the date of purchase.

The statute of limitations for conversion claims is two years from the date the cause of action accrues. Tex. Civ. P. Rem. Code 16.003(a). A cause of action accrues and the two-year limitations period begins to run as soon as the owner suffers some injury, regardless of when the injury becomes discoverable. *Computer Associates International, Inc. v. Altai, Inc.*, 918 S.W.2d 453 (Tex. 1996). In conversion claims, the general rule is that limitations begin to run at the time of the unlawful taking and expire in two years. *Republic Supply Co. v. French Oil Co.*, 392 S.W.2d 462, 464–65 (Tex. Civ. App.—El Paso 1965, no writ); *Rogers*, 930 S.W.2d at 159 (applying two year statute of limitations to conversion of oil).

Limitations began to run on Dynamic's conversions claim each time CIMA "wrongfully exercised dominion and control" over Dynamic's oil and gas when it purchased the production from North Shore. *See Pemex Exploracion y Produccion*, 2013 WL 5514944, at *31 (holding that conversion claim against buyer of stolen oil accrued when it was purchased from the thief, not when it was first stolen). The evidence shows that CIMA purchased the production from North Shore monthly from January 2010 until March 2016. Defs.' Mot. for Summ. J. Ex. G, ECF No. 32-2. Applying the general rule to this case, Dynamic had two years from the date of each purchase to file suit for conversion. Because this suit was filed on December 19, 2016, any conversion claims arising from purchases before December 19, 2014 are barred unless

limitations were tolled.

**2.    Limitations is not tolled.**

Dynamic asks the court to hold that the Goliad Case prevented it from suing CIMA for conversion and to equitably toll limitations. Pl's. Mot. Part. Summ. J. 27-29, ECF No. 21. Dynamic notes that Texas tolls limitations "for a second cause of action in instances where the viability of the second cause of action necessarily depends upon the outcome of the first case and the pursuit of the second suit prior to that outcome would either be improper or result in judicial complications." *Id.* at 24 (citing *Cavitt v. Amsler*, 242 S.W 246, 249 (Tex. Civ. App.—Austin 1922, writ dism'd w.o.j.)). Dynamic argues that it was precluded from bringing a claim against CIMA when the trial court granted summary judgment in favor of North Shore on September 20, 2011, giving ownership of the well and production to North Shore. Dynamic insists that impediment was not removed until the Texas Supreme Court issued its opinion overturning the trial court's decision effective December 9, 2016. *Id.* at 29. Dynamic argues, in part, that it could not sue after the summary judgment ruling because "CIMA would have undoubtedly asserted that Dynamic could not recover until it established title to the Well." *Id.* at 26. Dynamic reasons, then, that it could not sue CIMA until after it established title in the Goliad case.

Dynamic also argues that the Goliad court's rulings prevented Dynamic from asserting a claim against CIMA. Pl's. Resp. 4, ECF No. 37. Dynamic identifies two orders:

i.    A January 2011 order requiring North Shore to deposit royalty payments into the court registry and the trial court's subsequent refusal to secure all production revenue with the court; and


ii.    The September 12, 2011 summary judgment order holding that North Shore's option covered the well and voiding Dynamic's lease.

Dynamic argues that because these "controlling court orders were contrary to its title dispute," it

could "assert no claim against CIMA" and limitations should be tolled from September 20, 2011 until December 9, 2016. *Id.* at 5.

The purpose of a statute of limitations is to provide a cut-off point for certain legal rights and to avoid stale claims. *Safeway Stores, Inc. v. CertainTeed Corp.*, 710 S.W.2d 544, 545–46 (Tex. 1986). "Limitations statutes afford plaintiffs what the legislature deems a reasonable time to present their claims and protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise." *Murray v. San Jacinto Agency, Inc*., 800 S.W.2d 826, 828 (Tex. 1990). Statutes of limitations are a legislative assessment of the merits of cases in general and are strictly applied. *Robinson v. Weaver*, 550 S.W.2d 18, 20 (Tex. 1977); *Velocity Databank, Inc. v. Shell Offshore, Inc.,* 456 S.W.3d 605, 609 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). However, Texas courts have crafted an equitable rule to protect a party who is prevented from exercising his rights because of a judicial impediment. *See Cavitt*, 242 S.W. at 249; *accord Hughes v. Mahaney & Higgins*, 821 S.W.2d 154, 157 (Tex. 1991) ("where a person is prevented from exercising his legal remedy by the pendency of legal proceedings, the time during which he is thus prevented should not be counted against him"). For the rule to apply, Plaintiff must be *prevented* from bringing an action because its viability has not yet been established by another suit, or the prosecution of two suits at the same time must create a specific judicial complication that is common in attorney malpractice claims. *See Rogers*, 930 S.W.2d at 167. Neither is true here.[10]

---

[10]   The nature of legal malpractice claims create a conflict between the client and the attorney that is heightened when the underlying lawsuit is on appeal.  *Hughes*, 821 S.W.2d at 157.  During the appeal of the underlying suit, the client must contend that the attorney's conduct was appropriate, while arguing in the malpractice claim it was not. These conflicting positions compromise the likelihood of success in both suits.  Since the viability of the malpractice claims depends, in part, upon the outcome of the underlying appeal, equitable tolling was applied.  *Id.*   Dynamic does not argue any such conflict in these cases.

Dynamic points to the language in *Cavitt* to support its position that the Goliad case was a judicial impediment preventing it from pursuing its conversion claim against CIMA. Superficially, the broad language in *Cavitt* seems to support Dynamic's position.  *Cavitt*, however, is distinguishable. In its response, CIMA relies almost solely on the decision in *Rogers* to support its argument that limitations should not toll. As Dynamic notes, however, *Rogers* involved only a single lawsuit and is not directly applicable here. Even so, the reasoning of the court in *Rogers* is both instructive and persuasive.

The court in *Rogers* was confronted with a version of the argument Dynamic has made here. The plaintiffs in *Rogers* brought claims for trespass to try title and conversion following an invalid transfer of title. They argued the statute of limitations for the conversion claims should be tolled until after the final resolution of their real property title litigation, and the conversion claim should not be limited to only two years before suit was filed. To determine whether limitations barred the conversion claims, the court first had to determine when those claims accrued. *Rogers,* 930 S.W.2d at 166. Using the same language that Dynamic has cited in its motion, the court acknowledged that "a right or cause of action does not exist until facts exist which authorize the person to seek relief." *Id.; see* Pl's. Resp. 21, ECF No. 37. In a conversion case, that happens when the taking occurs. 930 S.W.2d at 166. Since the cause of action accrued when the taking occurred, the court turned its consideration to whether *Cavitt* would apply to toll limitations on the conversion claim until after there was a suit to establish title to the oil and gas. *Id.* at 167. The court examined whether the existence of the conversion claim did, in fact, depend upon a prior successful outcome of the trespass to try title claim. As the *Rogers'* court dryly noted, "the books are replete with cases in which both questions are determined in a single case." *Id.* "Indeed, because ownership of property or a superior right to possession of the personal property at the

time of conversion is material as bearing on the issue of conversion, that question is inextricably intertwined with the determination of conversion. . ." *Id.* From this, the *Rogers'* court concluded that a prior judicial determination of ownership is not a prerequisite to asserting a claim for conversion. *Id.* It follows, then, that if it is not a prerequisite, it cannot be an impediment to filing suit.

The judicial impediment exception is a narrow one, and in practice it has been narrowly applied. The plaintiff in *Cavitt* could not have sued the mill for failing to pay dividends because the court issued an injunction that prevented the mill from paying those dividends. 242 S.W. at 251*; see also, Ellis v. Edward Abstract & Title Co*., No. 13-98-578-CV, 2000 WL 35721235, at *4 (Tex. App.—Corpus Christi May 11, 2000, no pet.) (describing *Cavitt* as a "suit prevented by injunction."). The rule has subsequently been applied to legal malpractice claims (*Hughes*, 821 S.W.2d at 154); bankruptcy claims (*Peterson v. Texas Commerce Bank-Austin, N.A.*, 844 S.W.2d 291, 293-94 (Tex. App.—Austin 1992, no writ), appeals (*Walker v. Hanes*, 570 S.W.2d 534, 540 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.), and to a unique fact pattern involved in a claim for money had and received (*Merry Homes v. Luc Dao*, No. 14-16-00274-CV, 2017 WL 4159206, at *5 (Tex. App.—Houston [14th Dist.] 2017, no pet.)(not designated for publication). There is no reason to apply it to this case because Dynamic was not actually barred from filing suit against CIMA. *See Mathers Family Trust v. Cagle*, No. 3:13-cv-1035, 2013 WL 3455489 (N.D. Tex. 2013) (improperly filing suit in Colorado does not toll limitation for suit in Texas because plaintiff could have filed both suits at the same time). As the court in *Rogers* stated, Dynamic was able to assert a claim for conversion at the same time it disputed ownership. In the Goliad case against North Shore, it did. Nothing prevented it from asserting a claim against CIMA at that time, either in the same litigation or a separate suit.

Dynamic argues that the policy behind the equitable tolling rule compels a finding that it should be applied here. Pl's. Mot. Part. Summ. J. 27, ECF No. 21. It stresses that a "court will not require a party to do a useless, burdensome, or duplicative act that ties up both litigant and court time unnecessarily, either without a chance of final resolution (until the underlying suit is resolved) or creating the possibility of conflicting results if two different suits were filed." *Id.* (quoting *Rogers*, 930 S.W.2d at 167). Requiring a party to timely assert its claims against others to avoid stale claims, however, is neither duplicative nor burdensome. Dynamic insists that "filing a case only to have it stayed or . . . risk[] a judgment inconsistent with the Texas Supreme Court's ultimate decision is exactly the sort of needless activity the equitable tolling principal is designed to avoid." *Id.* at 29. Even assuming that to be true, it does not follow that *Cavitt* is applicable, or that tolling is warranted: the Goliad suit did not enjoin Dynamic from suing for conversion; a second lawsuit can be abated; and reversal on appeal removes any preclusive effect of a separate, inconsistent decision. *See Murphy v. Campbell,* 964 S.W.2d 265, 270 (Tex. 1997) ("While it may be necessary to abate a malpractice suit pending resolution of a dispute with the taxing authority, we view that procedure as preferable to holding that limitations on a plaintiff's claim begins to run when plaintiff decides it should."); *Scurlock Oil v. Smithwick*, 724 S.W.2d 1, 6 (Tex. 1986) ("A judgment in a second case based upon the preclusive effects of a prior judgment should not stand if the first judgment is reversed.").

When Dynamic filed its counterclaim against North Shore, it could have asserted a claim against CIMA. The trial court's ruling that it now relies on as an impediment was not entered for almost a year after Dynamic asserted its counterclaim. Dynamic also could have sued CIMA in the same litigation with North Shore, which would have avoided the potential inconsistent results it points to now. Instead, Dynamic made a strategy choice not to pursue CIMA at the same time

it was in litigation with North Shore. The tolling rules were not designed to save a party from their own mistakes. Quite to the contrary, "Texas courts sparingly apply equitable tolling and look, *inter alia,* to whether a plaintiff diligently pursued his rights; litigants may not use the doctrine 'to avoid the consequences of their own negligence.'" *Myers v. Nash*, 464 F. App'x 348, 349 (5th Cir. 2012) (quoting *Hand v. Stevens Transport, Inc.*, 83 S.W.3d 286, 293 (Tex. App.—Dallas 2002, no pet.)). In this case, there is no applicable tolling rule to save Dynamic's conversion claims before December 19, 2014.

## C.    CIMA's Motion for Partial Judgment on the Pleading on Dynamic's request for Attorney's Fees is Premature.

Attorney's fees are not recoverable in an action in tort unless provided by statute or by a contract between the parties. *New Amsterdam Cas. Co. v. Texas Indus., Inc.*, 414 S.W.2d 914, 915 (Tex. 1967). There is no statute providing for recovery of attorney's fees on a conversion claim, so attorney's fees generally are not recoverable, either as actual or as exemplary damages. *Pierson v. GFH Fin. Servs. Corp.*, 829 S.W.2d 311, 316 (Tex. App.—Austin 1992, no writ); *George Thomas Homes, Inc. v. Southwest Tension Sys., Inc.*, 763 S.W.2d 797, 800 (Tex. App.—El Paso 1988, no writ); *Jay Fikes and Assocs. v. Walton*, 578 S.W.2d 885, 888 (Tex. Civ. App.—Amarillo 1979, writ ref'd n.r.e.). An exception arises when the conversion action is grounded in a contract. In that instance, attorney's fees may be recovered. *Exxon Corp. v. Bell*, 695 S.W.2d 788, 791 (Tex. App.—Texarkana 1985, no writ) (resolution of the conversion claim depended entirely on whether the contract for sale of a water well included the pump that was removed); *see also Kucel v. Walter E. Heller & Co.*, 813 F.2d 67 (5th Cir. 1987) (citing *Bell* for the position that Texas allows attorney's fees in conversion actions founded on contract interpretation); *Abraham & Co., Inc. v. Smith*, No. 14-03-00163-CV, 2004 WL 210570, at *4 (Tex. App.—Houston [14th Dist.] Feb. 5, 2004, no pet.)(mem. op.) (attorney's fees allowed where conversion

claim was grounded on oral contract); *Wallace v. Harper*, No. 04-97-00704-CV, 1998 WL 201723, at *5 (Tex. App.—San Antonio Apr. 22, 1998, no pet.)(mem. op.)(conversion claim was sufficiently grounded on contract to support an award of attorney's fees); *First National Bank v. Gittelman*, 788 S.W.2d 165 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (attorney's fees awarded when the conversion arose from a wrongful repossession under the lease contract). *But see Braly v. Wade*, No. 06-98-00057-CV, 1999 WL 356064, at *4 (Tex. App.—Texarkana May 13, 1999, no pet.)(mem. op.)(rejecting argument that conversion of property was a breach of the lease agreement).

Plaintiff's First Amended Petition has not pled a cause of action for which it can recover attorney's fees in this case. Attorney's fees are not recoverable for conversion and Dynamic does not argue that its conversion claim is "founded on contract interpretation." Because of that, the general rule applies and attorney's fees are not recoverable for Dynamic's conversion claim in this case.

Dynamic's argument, however, is more nuanced. It contends that the litigation in the Goliad suit was initiated in furtherance of North Shore's scheme to steal the production. Pl's. Resp. 4, ECF No. 40. It argues that CIMA funded the litigation through its continued purchases, causing Dynamic to incur attorney's fees in that case. *Id.* at 2. Because the Goliad lawsuit was part of the conversion and conspiracy to commit conversion, Dynamic argues, its attorney's fees from that lawsuit are actual damages caused by CIMA's conduct. Texas courts have held that attorney's fees incurred in litigation with a third party may be recoverable as actual damages. *Am. Home Assur. Co. v. United Space All., LLC*, 378 F.3d 482, 490 (5th Cir. 2004); *Turner v. Turner*, 385 S.W.2d 230, 234 (Tex. 1964); *Lesikar v. Rappeport*, 33 S.W.3d 282, 306 (Tex. App.—Texarkana 2000, pet. denied). The recovery of attorney's fees in such circumstances are

based upon the equitable ground that the claimant was required to defend against litigation as a consequence of the wrongful conduct of the defendant. *See United States Casualty Co. v. Schlein*, 338 F.2d 169, 175 (5th Cir. 1964); *Powell v. Narried*, 463 S.W.2d 43, 46 (Tex. Civ. App.—El Paso 1971, writ ref'd n.r.e.).

It is not necessary to decide, at this time, if the attorney's fees incurred in the Goliad case are recoverable as actual damages in this case. Whether Dynamic's attorney's fees from the Goliad suit are recoverable as actual damages is a question about the elements of damages to be submitted to the jury during trial, which the trial judge will determine at the time of trial. Further, Dynamic has not actually pled a cause of action to recover attorney's fees, it has only prayed for them as damages. As such, there is nothing to dismiss. For those reasons, Plaintiff's Motion for Partial Judgment on the Pleadings on Dynamic's claim for Attorney's Fees is premature and should be denied.

## IV.    CONCLUSION

The Court **RECOMMENDS** the following:

1) Dynamic's Motion for Partial Summary Judgment for conversion should be **GRANTED;**

2) in all other respects, Dynamic's motion should be **DENIED**;

3) CIMA's Motion for Summary Judgment on the affirmative defense of limitations should be **GRANTED**, in part, to the extent Dynamic alleges claims for conversion occurring before December 19, 2014, and those claims should be **DISMISSED WITH PREJUDICE;**

4) In all other respects, CIMA's Motion for Summary Judgment should be **DENIED**;

5) CIMA's Motion for Partial Judgment on the Pleadings on Plaintiff's Claim for Attorneys' Fees should be **DENIED** because it is premature.

**The Parties have fourteen days from service of this Report and Recommendation to**

**file written objections. 28 U.S.C. § 636(b) (1) (C); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude review of factual findings or legal conclusions, except for plain error.** *Quinn v. Guerrero***, 863 F.3d 353, 358 (5th Cir. 2017).**

Signed on February 21, 2018, at Houston, Texas.

_____
**Dena Hanovice Palermo**
**United States Magistrate Judge**